1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDDIE LOPEZ MONTANEZ,<br><br>               Petitioner,<br><br>v.<br><br>JEFFREY BEARD, Secretary,<br><br>               Respondent. | Civil No.   15-0173 BTM (BLM)<br><br>**REPORT AND RECOMMENDATION RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**ORDER DENYING REQUEST FOR AN EVIDENTIARY HEARING** |

## I.   INTRODUCTION

Petitioner Eddie Lopez Montanez ("Petitioner" or "Montanez"),[1] a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition"), challenging his conviction for first degree murder in San Diego County Superior Court case number SCN204723. (Pet. at 1, ECF No. 1.)[2] The Court has reviewed the Petition, the Answer, the Traverse, the lodgments, and all the supporting documents submitted by both

---

[1]   Petitioner was tried jointly with his brother, Steve Montanez, with separate juries. (*See* Lodgment No. 2, vol. 10 at 531.)  The case also involves an accomplice named Eddie Cabanyog.  For the purposes of clarity, the Court will refer to Steve Montanez as "Steve" and Eddie Cabanyog as "Cabanyog."

[2]   Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

parties.  For the reasons discussed below, the Court **DENIES** the request for an evidentiary hearing and **RECOMMENDS** the Petition be **DENIED**.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The following facts are taken from the California Court of Appeal opinion[3]:

### INTRODUCTION

A jury convicted Steve L. Montanez (Steve) of the first degree murder of Delores Attig (Pen. Code, § 187, subd. (a)) [Footnote omitted.] and found true special circumstance allegations he committed the murder while aiding and abetting robbery, rape and oral copulation (§ 190.2, subd. (a)(17)).  The jury additionally found true an allegation he was armed with a firearm during the murder (§ 12022, subd. (a)).  A separate jury in the same trial also convicted Steve's brother, Eddie L. Montanez (Eddie), of the first degree murder of Attig and found the firearm enhancement allegation true, but found the special circumstance allegations not true.

The trial court sentenced Steve to life in prison without the possibility of parole plus one year for the firearm enhancement.  The court sentenced Eddie to 25 years to life in prison for the murder conviction plus one year for the firearm enhancement.

### BACKGROUND

Prosecution's Case

Evidence Presented to Both Juries

In the middle of a night in June 1986, Michael Stanton, Star Lutes, and Attig drove Lutes's car to a dirt lot near a residential area below the Balboa Park municipal golf course to drink beer, smoke cigarettes, and listen to music.  Stanton sat in the driver's seat and Attig and Lutes sat in the backseat.  A Hispanic man came up from

---

[3]  Petitioner and his brother were tried jointly with separate juries and their appeals were consolidated.  The Court of Appeal opinion therefore included facts which were admitted only against Steve.  This Court has omitted the facts which were not based on evidence admitted against Montanez.

behind Stanton, put a gun to the left back side of his neck and told him not to move.  The man commanded Stanton to crawl out through the passenger side of the car with his head down.  Stanton heard a ruckus coming from the back of the car and, out of the corner of his eye, saw someone holding a gun to Lutes's head. Stanton thought there were three to five men and heard three or four voices besides his own, Lutes's and Attig's.

Stanton complied with the man's command and ended up outside the car, face down in the dirt.  Almost immediately, Lutes was thrown to the ground next to Stanton. The attackers put a gun to Stanton's head and told Stanton and Lutes not to move or they would be blown away.  The attackers said they had previously killed three people.  The attackers bound Stanton and Lutes and went through their pockets.  They took about $15 and a small amount of marijuana from Stanton.

Stanton heard Attig being led away to a nearby embankment as she said, "No. Please.  No.  Please."  Sometime later, Stanton heard a single gunshot coming from the direction where Attig had been taken.  About 15 minutes after hearing the gunshot, Stanton realized the attackers had left.  Stanton and Lutes freed themselves and called out for Attig.  When Attig did not respond, Stanton and Lutes ran to Stanton's nearby apartment and Lutes called 911.

The responding officers took Lutes to look for Attig.  They discovered Attig's body about 50 feet from Lutes's car.  Attig was lying on her back, naked, with her legs spread open.  A jacket covered her face.  There was a lot of blood around her head and in her mouth.  She had abrasions on her knees, shin, flank, and left forearm that were consistent with a physical struggle or a collapse at the scene, but no defensive injuries. She died from a gunshot fired close to her head.

Around 4:00 a.m., a night manager of a gas station in San Clemente saw a red or maroon car with four Hispanic males drive into the station.  The driver and front seat passenger got out of the car.  The driver had scratches and injuries on his face.  He and the front seat passenger appeared older than the two backseat passengers.

The driver asked to use the restrooms, which were around the corner of the building.  The driver and front passenger went toward the restrooms.  The night manager followed and found the two men in the ladies' room.  When he commented on their mistake, the driver became angry. The front passenger calmed the driver down and the night manager went about his business.  At some point, the men moved their car next to the restrooms and sat there.  They left after about 20 to 30 minutes.

Several days later, a police detective went to the gas station and retrieved Attig's wallet from one of the station's managers. The detective also retrieved Attig's purse from the station's dumpster, where the manager had thrown it the previous day.

Approximately two decades later, a criminalist reviewing cold cases conducted DNA testing on the evidence impounded in 1986, including swabs from Attig's oral, vaginal, and anal cavities.  The testing showed at least three men contributed to sperm found in the vaginal and anal cavities, with Richard Archuleta being the predominant contributor.  [Footnote omitted.]   At least two individuals contributed to sperm found in the oral cavity, with Steve being the predominate contributor.   The criminalist also tested semen stains on Attig's blouse and jeans.  The testing showed at least three men contributed to the stains, including Archuleta, Steve, and Steve's stepson, Eddie Cabanyog.  The stains on the jeans also contained the DNA of an unknown male.

Steve and Cabanyog had access to a red Honda in 1986.  After his arrest, Steve told a police detective he had only been to San Diego once, approximately six to eight years earlier.

. . . .

Evidence Presented Only to Eddie's Jury

Eddie told police detectives that, on the day of the murder, he, Steve, Archuleta, and Cabanyog traveled in Steve's red or maroon Honda from Coachella to Mecca and then to San Diego. They ended up in a residential area near a park area or open field and they all got out to urinate.  Steve and one of the others ran ahead toward the park area.  Eddie followed and when he caught up to Steve, Steve had a gun pointed at two men and a woman, who were holding their hands up. Eddie thought Steve was robbing them. Steve told the others to keep an eye on the men as he led the woman away at gunpoint and engaged in sex acts with her. After about 10 minutes, Steve called for the others to have their turn. Eddie initially declined and stayed with the two men, but Steve kept calling him over to the woman in a louder voice.  He saw Steve standing over the woman with a gun and gave in because he was afraid of Steve, who was the family disciplinarian and had a violent reputation.  He apologized to the woman.  She looked away and asked him not to hurt her.  He felt bad about what happened, did not want to participate, and did not believe he actually penetrated her or completed the act.  Another person followed him and then all of them took off running toward their car except Steve, who stood back.  After Eddie and the others were a distance away, Eddie heard a single gunshot.

On his way back to the car, Steve fell and scratched his face, arms, and hands.  After he reached the car and got in, someone asked about the gunshot.  He told them he fired a shot in the air to scare the victims.

/ / /

/ / /

/ / /

/ / /

Defense Case

Evidence Presented to Both Juries

Eddie testified Steve is his brother and is five years older. As young children, they had lived with their dad until their dad killed their stepmother in their presence. Steve became the family disciplinarian and, when Eddie was seven, Steve would beat him about two or three times a week. Steve was known to explode, he had a reputation for violence and Eddie was afraid of him. Steve never beat Eddie up when they were both adults, although Eddie purposefully stayed away from Steve when Steve got mad or was drinking or using drugs.

In 1986, Eddie moved to Coachella with his mother and uncle. He lived a few houses down from Steve and his family. Steve had been in prison and was released sometime around April 1986. While in prison, Steve became involved with the Mexican Mafia. Sometime the same year of Attig's murder, Eddie saw Steve hit an unsuspecting person with a two-by-four.

Although Eddie witnessed some of the events surrounding Attig's murder, he denied having anything to do with them and instead stood back while they occurred. Eddie knew what Steve was doing with Attig because he heard her say, "Please no. Don't," he heard Steve tell her to shut up and not to scream, and he saw Steve on top of her.

After Steve finished with Attig, he called for the others to take their turn. At the time, he had a gun in his hand. After someone else took their turn, Steve waved his gun and told Eddie "to get [his] ass over there" and take his turn. Eddie agreed to take his turn because he was scared. Steve stood by Attig with the gun pointed at her. Eddie got on top of her and "faked it" by pulling his pants down, but leaving his underwear on. After Eddie pulled his pants down, Steve walked away. Steve never pointed the gun at Eddie. He also never threatened to shoot Eddie unless Eddie raped Attig.

After the incident, Steve and Eddie stayed in contact with one another and associated with one another. After their arrest, Eddie asked not to be placed with Steve because he was scared he might be killed for talking.

A toxicologist testified that acid phosphatase testing of an oral swab showed there was no sperm on the swab. A forensic pathologist testified there was no sperm on slides prepared from the oral or the rectal swabs. However, a forensic serologist testified there was, in fact, sperm on the slide prepared from an oral swab. He also testified the rectal swab sample was likely contaminated by vaginal drainage. Another forensic serologist conducted DNA testing on additional semen stains found on Attig's clothing and testified Eddie was excluded as a contributor to the stains.

/ / /

1
2
          At the time of the incident, Steve was 28 or 29, Eddie was 23, Archuleta was 17 and Cabanyog was 15.  Steve was also five inches shorter than Eddie.

3
          Evidence Presented Only to Eddie's Jury

4
5
6
7
          Eight character witnesses testified Eddie was not the type of person who would rape a woman.  Juan Cantu, Steve and Eddie's half brother, testified he was afraid of Steve because Steve was the family disciplinarian and would beat up his brothers, including Eddie and Cantu. Cantu also saw Steve beat up his sister's boyfriend.  Their mother was not able to stop the beatings.

8
(Lodgment No. 5 at 3-9.)

9
### III.  PROCEDURAL BACKGROUND

10
11
12
13
14
15
16
17
18
19
          On August 19, 2009, the San Diego County District's Attorney Office filed an Amended Information charging Montanez with premeditated murder (Cal. Penal Code §§187(a); 189).  (Lodgment No. 1, vol. 1 at 277-79.) The information also alleged, as special circumstances, that Petitioner aided and abetted the murder during the commission of robbery, rape, sodomy and oral copulation (Cal. Penal Code § 190.2(a)(17).  (*Id.* at 278.)   It was further alleged Petitioner was armed with a firearm during the commission of the murder (Cal. Penal Code § 12022(a)(1)).  (*Id.*)  Petitioner's brother, Steve Montanez, was charged with the same offense and special allegations.  (*See id.* at 227-279.)   The two were tried jointly by separate juries.

20
21
22
23
24
25
26
          On July 23, 2010, a jury found Petitioner guilty of first degree murder.  (*Id.* vol. 6 at 1505; *see also* Lodgment No. 2, vol. 29 at 4031-32.)  The jury further found Montanez was armed with a firearm during the commission of the offense.  (*See* Lodgment No. 1, vol. 6 at 1505.)  The jury found the special circumstances as to robbery, rape, sodomy and oral copulation, "not true."  (*Id.* at 1506-07, *see also* Lodgment No. 2, vol. 29 at 4032-33.)  The trial court sentenced Petitioner to 26 years to life in prison.  (*See* Lodgment No. 2, vol. 30 at 4043.)

27
/ / /

28
/ / /

1     Petitioner appealed to the California Court of Appeal.  (*See* Lodgment No.
2  3.)  He argued the trial court erred in refusing to instruct the jury it was the
3  prosecution's burden to "disprov[e] his duress defense beyond a reasonable
4  doubt." (*See id.* at 21-34.)  On November 14, 2012, the appellate court affirmed
5  Petitioner's conviction in an unpublished opinion.  (*See* Lodgment No. 5.)
6  Petitioner then filed a petition for review in the California Supreme Court, which
7  was denied on January 30, 2013 without comment or citation.  (*See* Lodgment
8  Nos. 6 & 7.)

9     Petitioner filed a petition for writ of habeas corpus in the San Diego County
10  Superior Court on January 27, 2014.  (Lodgment No. 8.)  In it, he argued the
11  trial court erred when instructing the jury on "aiding and abetting." (*See id.* at
12  3A-3I.)  He also claimed the trial court improperly accepted inconsistent verdicts
13  from the jury (*see id.*), his trial counsel was ineffective (*id.* at 4-4B), as was his
14  appellate attorney. (*See id.* at 5-5D.)  The trial court denied the petition on
15  March 27, 2014 in a reasoned decision.  (Lodgment No. 9.)

16     On April 23, 2014, Montanez filed a petition for habeas corpus with the
17  state appellate court, raising the same claims presented in his petition to the trial
18  court. (*See* Lodgment No. 10.)  The appellate court denied the petition on June
19  24, 2014 in a brief reasoned opinion. (*See* Lodgment No. 11.)  Finally, on July
20  25, 2014, Petitioner filed a petition for writ of habeas corpus in the California
21  Supreme Court. (*See* Lodgment No. 12.)  The court denied the petition without
22  comment or citation on October 15, 2014. (*See* Lodgment No. 13.)

23     On January 26, 2015, Montanez filed the instant federal petition for writ of
24  habeas corpus. (ECF No. 1.)  Respondent filed an Answer and Memorandum of

25
26
27
28

1  Points and Authorities in support on April 9, 2015. (ECF No. 7.)  Petitioner filed

2  his Traverse on August 19, 2015.[4] (ECF No.  19.)

3  **IV.   DISCUSSION**

4       Montenaz raises five claims in the Petition.  First, he argues his due process

5  rights were violated when the trial court erroneously refused to instruct the jury

6  that the prosecutor had the burden of disproving duress beyond a reasonable

7  doubt.  (*See* Pet. at 6, 30-38, ECF No. 1.)  Next, he claims the trial court erred

8  when it instructed the jury on "aiding and abetting" and when it accepted

9  inconsistent verdicts from the jury.  (*See id.* at 7, 42-48.)  In claims three and

10 four, Petitioner contends he received ineffective assistance of trial counsel and

11 appellate counsel, respectively.  (*See id.* at 8-9, 49-57.)  Finally, Montanez

12 argues in ground five that his trial was rendered fundamentally unfair by

13 cumulative errors.  (*See id.* at 10, 58-59.)

14      Respondent argues that claim one is not cognizable on federal habeas,

15 ground two is procedurally barred, and ground five is unexhausted.  (*See* Mem.

16 of P. & A. Supp. Answer at 12-16, 18-19.)  Respondent further asserts the state

17 court's denial of all claims one through four was neither contrary to, nor an

18 unreasonable application of, clearly established law, and that claim five should

19 also be denied on the merits.  (*See generally, id.*)

20      **A.     Standard of Review**

21      Montanez's Petition is governed by the provisions of the Antiterrorism and

22 Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S.

23 320 (1997).  Under AEDPA, a habeas petition will not be granted unless that

24 adjudication: (1) resulted in a decision that was contrary to, or involved an

25

---

26      [4] On September 23, 2015, Petitioner filed a "corrected" Traverse.  ECF No. 23.  The
   Court has compared the corrected Traverse with the original Traverse and determined that
27 the substance of the corrected Traverse is identical to the original Traverse but the corrected
   Traverse contains a Table of Contents, Table of Authorities, and date and time notations.  The
28 Court will cite only to the original Traverse.

unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411

(2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## B.   Failure to Instruct on Duress

In claim one, Montanez argues his due process rights were violated when the trial court failed to properly instruct the jury it was the prosecution's burden to disprove duress beyond a reasonable doubt. (Pet. at 30-38.) Specifically, he argues the appellate court's conclusion that the instructional error was "harmless beyond a reasonable doubt" was unreasonable (*Id.* at 36-38; *see also* Traverse at 5-7.)

1.    Cognizable Claim

Respondent first argues this claim fails to raise a federal question.  (Mem. of P. & A. Supp. Answer at 13.)  To present a federal habeas corpus claim under § 2254, a state prisoner must allege both that he is in custody pursuant to a "judgment of a State court" and that he is in custody in "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  A state's interpretation of its laws or rules provides no basis for federal habeas corpus relief because no federal constitutional question arises.  *Id.*

Claims of error concerning state jury instructions are generally matters of state law that are not cognizable on federal habeas review.  *See Gilmore v. Taylor*, 508 U.S. 333, 343 (1993); *see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). Yet, federal habeas relief based on a claim of instructional error is available when a petitioner demonstrates that "[an] ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72; *see also Waddington v. Sarausad*, 555 U.S. 179, 191 (same) (citations omitted).  Here, Petitioner argues his trial was rendered fundamentally unfair by the erroneous jury instruction.  As such, to the extent Petitioner raises a due process claim, ground one is cognizable on federal habeas.

2.    Merits

Petitioner raised this claim in his petition for review to the California Supreme Court, which was denied without comment or citation. (*See* Lodgment Nos. 6 & 7.)  Thus, this Court must "look through" to the California Court of Appeal's opinion. *Ylst*, 501 U.S. at 806. The appellate court denied Montanez's claim, stating:

Using a modified version of CALCRIM No. 3402, the trial court instructed Eddie's jury regarding the defense of duress as follows:

"The defendant is not guilty of Murder and/or Special Circumstances alleged herein if he acted under duress. The defendant acted under duress if, because of threat or menace, he believed that his life would be in immediate danger if he refused a demand or request to commit the crime[s]. The demand or request may have been express or implied. [¶] The defendant's belief that his life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed. [¶] A threat of future harm is not sufficient; the danger to life must have been immediate.[¶]"

Because the trial court considered it a misstatement of law, the trial court refused to instruct the jury with the part of the CALCRIM No. 3402 that states, "The People must prove beyond a reasonable doubt that the defendant did not act under duress.  If the People have not met this burden, you must find the defendant not guilty of murder."    Eddie contends the trial court's refusal to give this part of the instruction requires reversal of his conviction.  The People concede the error, but contend it was harmless beyond a reasonable doubt.  We agree with the People.

"A trial court must instruct the jury on the allocation and weight of the burden of proof [citations], and, of course, must do so correctly.  It must give such an instruction even in the absence of a request [citation], inasmuch as the allocation and weight of the burden of proof are issues that 'are closely and openly connected with the facts before the court, and . . . are necessary for the jury's understanding of the case'."  (*People v. Mower* (2002) 28 Cal.4th 457, 483-484.)  For a duress defense, a defendant has the burden of raising a reasonable doubt as to the existence of the facts underlying the defense. (*Id.* at p. 479, fn. 7; *People v. Graham* (1976) 57 Cal.App.3d 238, 240.)   The prosecution must then establish beyond a reasonable doubt the defense is inapplicable.  (*See People v. Saavedra* (2007) 156 Cal.App.4th 561, 571.)

As the trial court failed to fulfill its instructional duty, it plainly erred.  Instructional errors, including misdescriptions, omissions, or presumptions, are generally reviewed under the "harmless beyond a reasonable doubt" standard stated in *Chapman v. California* (1967) 386 U.S. 18, 24.  We, therefore, "'proceed to consider whether it appears beyond a reasonable doubt that the error did not contribute to this jury's verdict.'" (*People v. Huggins* (2006) 38 Cal.4th 175, 212.)

Although the trial court did not specifically instruct Eddie's jury on the burden of proof for the duress defense, the trial court's other instructions provided the jury with the necessary guidance.  The trial

court instructed the jury that Eddie was not guilty of murder if he acted under duress.  In addition, the trial court instructed the jury that Eddie was presumed innocent and the People had the burden of proving every element of the crime of murder, including the intent element, beyond a reasonable doubt.  The trial court also instructed the jury to consider the instructions as a whole, and that before the jury could rely on circumstantial evidence to conclude the defendant had the required intent or mental state, the jury must be convinced the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state.  The trial court explained that if the jury could draw two or more reasonable conclusions from the circumstantial evidence, and one supported a finding the defendant had the required intent and another supported a finding the defendant did not have the required intent, the jury must conclude circumstantial evidence did not prove the required intent.  Collectively, these instructions informed the jury that to prove Eddie guilty, the prosecution had to prove he did not act under duress.

Counsel's closing remarks both supported and demonstrated this burden of proof.  During his closing remarks, Eddie's counsel repeatedly emphasized Eddie did not have the burden of proving anything, but rather the prosecution had the burden to prove any fact necessary for a conviction, including Eddie's mental state, beyond a reasonable doubt.  Eddie's counsel also spent almost no time discussing the duress defense, taking the position the jury did not need to consider it because Eddie never committed a crime in the first place.  Conversely, the prosecutor devoted a considerable portion of her closing remarks to attacking Eddie's credibility about the facts underlying his duress defense and otherwise refuting the defense.

The prosecutor's task was not particularly difficult because of the weakness of the duress evidence.  The duress defense only applies where a person acted under threats or menaces sufficient to show the person had reasonable cause to and did believe the person's life would be endangered if the person refused.  (§ 26.)  "'The common characteristic of all the decisions upholding [a duress defense] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm.'"  (*People v. Vieira* (2005) 35 Cal.4th 264, 290.)  Eddie's own statements established any perceived threat from Steve was not immediate.  Although Steve had a gun when he called Eddie over to Attig, Steve pointed it at Attig. He did not point it at Eddie or otherwise threaten to use it on Eddie if Eddie did not follow orders.  Further, when Eddie realized what Steve was doing, he did not flee or attempt to stop Steve because he was surprised by Steve's actions, he was "a little intimidated" by Steve due to Steve's reputation, and he was scared and was not using good judgment.  None of these reasons shows he reasonably and actually believed his life was in immediate danger if he did not participate in raping Attig.  Accordingly, we conclude beyond a reasonable doubt the trial court's error in failing to instruct the jury with the burden of proof part of

the CALCRIM No. 3402 instruction did not contribute to the jury's verdict.

(*People v. Montanez*, No. D058128, 2012 WL 6582541, at *7-9 (Cal. Ct. App. Nov. 14, 2012; Lodgment No. 5 at 17-20.)

As an initial matter, to the extent Petitioner argues his due process rights were violated by a purported failure of the prosecution to disprove duress, he is not entitled to relief.  "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  The prosecution need not establish the defendant's lack of defenses, however. *See, e.g., Patterson v. New York*, 432 U.S. 197, 210 (1977) (holding that due process does not require a state to "disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused").  The Supreme Court has specifically held there is "no constitutional basis for placing upon the Government the burden of disproving [the] duress defense beyond a reasonable doubt." *Dixon v. United States*, 548 U.S. 1, 8 (2006).

As for the instructional error, on federal habeas such errors can form the basis for relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The erroneous jury instruction cannot be judged in isolation, however. *Estelle*, 502 U.S. at 72.  It must be considered in the context of the entire trial record and the instructions as a whole. *Id.*  Furthermore, jury instruction error is subject to harmless error analysis. *California v. Roy*, 519 U.S. 2, 6 (1996); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

Under California law, duress is a defense available to defendants who commit a crime "under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."  Cal. Penal Code § 26(6); *People v. Wilson*, 36 Cal. 4th 309, 331 (2005).  Although duress is typically not a defense to murder, "it can provide a defense to murder on a felony-murder theory by negating the underlying felony." *People v. Anderson*, 28 Cal. 4th 767, 784 (2002).  "A trial court is required to instruct sua sponte on a duress defense if there is substantial evidence of the defense and it is consistent with the defendant's theory of the case." *Wilson*, 36 Cal. 4th at 331.  Once a defendant raises a reasonable doubt as to the facts underlying the defense of duress, it is the prosecution's burden to prove beyond a reasonable doubt that the defendant was not under duress. *See People v. Saavedra*, 156 Cal.App.4th 561, 571  (2007).  As the appellate court concluded, the trial court's failure to instruct the jury that the prosecution was required to "prove beyond a reasonable doubt that [Montanez] did not act under duress" was erroneous under California law.  The court determined, however, that the error was harmless beyond a reasonable doubt.  (*See* Lodgment No. 5 at 18-20.)

When a state court rules that an instructional error was harmless, a petitioner is not entitled to habeas relief unless he can establish that it resulted in "actual prejudice." *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)).  In order to grant relief under this test, a federal court must have "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

The Supreme Court has made it clear that this requirement does not mean that a state appellate court's harmless error determination is not entitled to deference under § 2254(d). *See Davis v. Ayala*, – U.S. –, 135 S. Ct. 2187, 2198 (2015).   Rather, the "*Brecht* standard 'subsumes' the requirements that

§ 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." *Id.* (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007)). While a federal court adjudicating a habeas petition does not need to "'formal[ly]' apply both *Brecht* and 'AEDPA/Chapman*,*' AEDPA nevertheless 'sets forth a precondition to the grant of habeas relief.'" *Ayala*, 135 S.Ct. at 2198.

Considering the instructions as a whole, the trial court's failure to specifically instruct the jury that it was the prosecution's burden to prove Montanez was not under duress did not have a "substantial and injurious effect" on the verdict.   As the appellate court noted, the jury was instructed the prosecution had the burden to prove Petitioner guilty beyond a reasonable doubt.[5]  (Lodgment No. 2, vol. 26 at 3684; *see also* Lodgment No. 1, vol. 5 at 1285.)  Moreover, the jury was instructed Petitioner was not guilty if it found he acted under duress.  (Lodgment No. 1 vol. 5 at 1310.)  The jury is presumed to

---

[5]  The jury was instructed under CALCRIM No. 220 as follows:

> The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

(Lodgment No. 1, vol. 5 at 1285.)

have followed the court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citation omitted).   Consequently, even though the jury was not instructed on the burden of proof applicable to the defense of duress, viewing the instructions as a whole, it is likely the jury understood the burden of proof belonged to the prosecution. *See Estelle*, 502 U.S. at 72.   Indeed, defense counsel stressed during closing argument that the defense had no burden, stating: "To give both sides a fair trial, you have to require that the people prove something beyond a reasonable doubt and prove certain facts beyond a reasonable doubt. . . . The defense has absolutely no burden of proof . . . . I don't have to prove to you a fact beyond a reasonable doubt. . . ." (Lodgment No. 2, vol. 26 at 3792.)

Even assuming the instructions, when considered as a whole, were ambiguous, Montanez would not be entitled to relief because given the evidence presented at trial, the failure to instruct the jury it was the prosecution's burden to disprove duress was harmless.  At trial, Montanez presented limited evidence to support his claim of duress.  Specifically, Montanez testified that when he and Steve were growing up, Steve would beat him two to three times a week. (Lodgment No. 2, vol. 24 at 3276-77; vol. 25 at 3468.)  He explained that Steve was known to explode, had a reputation for violence, and that he was fearful of Steve.  (*Id.* vol. 24 at 3277-78.)  He stated that during the incident, Steve was waving a gun around and pointing it at Attig.  He testified that he pretended to rape Attig because he was scared of his brother.  (*Id.* at 3317-20, 3334, vol. 20 at 2520; *see also* Lodgment No. 1, vol. 4 at 1122.)

Yet, Montanez also testified that Steve never pointed the gun at him and never threatened to hurt him if he refused to participate in Attig's rape. (Lodgment No. 2, vol. 24 at 3338.)  In addition, despite their childhood history, Montanez told detectives that Steve had not hit him since they both became

adults.[6]   (Lodgment No. 1, vol. 4 at 1126.)   He told detectives he was "intimidated" by Steve on the night of the incident but never stated that he feared for his life.  Rather, Montanez testified, he pretended to rape Attig to "get [Steve] off his back."  (Lodgment No. 2, vol. 24 at 3319-20.)  Thus, there was minimal, if any, evidence that Montanez reasonably believed that his life would be in "immediate danger if he refused a demand or request to commit the crime[s]."[7]

Moreover, there was substantial evidence that Montanez participated in the robbery and/or rape.  At trial, Michael Stanton testified that he, Lutes and Attig were parked in a dirt lot, drinking beer and smoking cigarettes.  (Lodgment No. 2, vol. 11 at 607.)  Suddenly, a man came up from behind and pointed a gun at Stanton's head.  He ordered Stanton to crawl out of the car.  Stanton complied and ended up face down in the dirt.  (*Id.* at 613-14.)  While this was going on, Stanton heard several voices and saw someone holding a gun to Lutes.  Shortly thereafter, Lutes was also thrown face down on the ground, next to Stanton.  (*Id.* at 615.)  There were three or four attackers.  (*Id.* at 614.)  Attig was led away and at least two men remained with Lutes and Stanton, with one holding a gun to Stanton's head.  (*Id.* at 616, 618.)  The men bound Stanton and Lutes and threatened to shoot them.  (*Id.* at 619.)  They took money from Stanton's pockets.  (*Id.* at 620.)

---

[6] At the time of the murder, Montanez was 24 years old and Steve was 28.  Cabanyog and Archuleta were juveniles, at 15 and 17 years old, respectively.  (Lodgment No. 2, vol. 24 at 3340.)

[7] Indeed, duress was only a small part of Montanez's defense.  Despite presenting some evidence of duress at trial, defense counsel's closing argument focused on Montanez's testimony that he was not guilty because he did not kill Attig, did not help anyone kill Attig, and did not participate in, or aid and abet the robbery or the rape.  (Lodgment No. 2, vol. 26 at 3771.)  He argued that Stanton and Lutes had made up the story about the robbery and that the evidence actually pointed toward a drug deal gone bad.  (*Id.* at 3774-75.)  He claimed Stanton's story was inconsistent with the physical evidence.  (*Id.* at 3777, 3782.)  Ultimately, defense counsel argued that Montanez was not guilty of felony murder, not because he acted under duress, but because he did not commit or aid and abet an underlying felony in the first place.

Shortly thereafter, Stanton heard a single gunshot coming from the direction Attig had been taken.  (*Id.* at 624.)  The attackers then left.  After Stanton and Lutes contacted the police, Attig's naked body was found about 50 feet from where Stanton had parked the car.  (*Id.* vol. 12 at 953-54.)  The cause of death was a single gunshot to the head.  (*Id.* vol. 12 at 953, 964.)

Meanwhile, at about 4:00 a.m., Theodore Dunn was working at a Unocal 76 gas station in San Clemente.  A reddish car with four Hispanic males pulled into the station.  (*Id.* vol. 13 at 1189-91.)  Dunn saw the driver and front seat passenger in the women's restroom, which was located near the dumpsters.  (*Id.* at 1166-97.)  Four days later, detectives retrieved a wallet containing Attig's driver's license at the San Clemente Unocal 76.  (*Id.* at 1266.)  Attig's purse was also found in the dumpster near the bathrooms.  (*Id.* at 1268.)

Sometime between 2000 and 2003, a David Cornacchia, a criminalist with the San Diego Police Department conducted DNA testing on evidence that had been gathered in 1986.  (*Id.* vol. 18 at 1933, 1966.)  He found sperm cells from at least three individuals in swabs taken from Attig's vaginal, oral and anal cavities.  From the sperm cells, Cornacchia was able to identify DNA belonging to Steve and Archuleta.  (*Id.* at 1948-60.)  He also found DNA from Steve, Archuleta and Cabanyog among sperm and non-sperm cells on Attig's clothes.  (*Id.* at 1960-81.)

In interviews with detectives, Montanez admitted he was with Steve, Cabonyog and Archuleta on the night of the murder.  (*Id.* at 1866-87.)  The four had been on a road trip in a maroon Honda and drove from Coachella to San Diego.  (*Id.* at 1867.)  They eventually ended up in a residential area were Steve and either Cabanyog or Archuleta, took off on foot ahead of Montanez and the fourth individual.  (*Id.*)

Montanez told detectives that when he caught up to them, Steve had a gun pointed at two men.  Steve then pointed the gun at the female who was with the

1   two men and led her away.  Montanez could see Steve in the distance, engaging
2   in sex acts with the woman.  (*Id.* at 1868-69.)  After Steve had been with the
3   woman for about 10 minutes, he called Montanez over to take his turn.  (*Id.* at
4   1869.)   Montanez told Steve he did not want to but his brother insisted so
5   Montanez apologized to the woman and took his turn.  Montanez told detectives
6   that he pulled his pants down and got on top of Attig, who was naked, but could
7   not remember if he ejaculated or penetrated her.  (*Id.* at 1870.)  Once all four
8   men had "taken their turn" with Attig, Montanez, Cabanyog and Archuleta ran
9   back to the car.  As they were heading to the car, Montanez heard a single
10  gunshot.  (*Id.* at 1872.)

11       The jury instructed that to find Montanez guilty of felony murder, it could
12  rely on robbery, and/or rape as the underlying felony.  (*See* Lodgment No. 1, vol.
13  5 at 1313.)  Under California law, unanimity instructions are not required for a
14  jury finding on the underlying felony in a felony murder charge.  *People v. Lewis*,
15  25 Cal.4th 610, 654 (2001).  Accordingly, it is possible that some jurors found
16  rape to be the underlying felony, while others determined it was robbery, or
17  both.  Furthermore, in order to find Motanez committed the underlying felony of
18  rape and/or robbery, the jury was not required to conclude Montanez himself
19  had raped Attig or robbed any of the victims.   The jury could find Montanez
20  committed the underlying felony as either perpetrator or aider and abettor.  And
21  under state law, the jury need not unanimously agree on the particular theory.
22  *People v. Wilson*,  44 Cal. 4th 758, 801 (2008) (stating a jury "need not decide
23  unanimously whether a defendant was a direct perpetrator or an aider and
24  abettor, so long as it is unanimous that he was one or the other").

25       Based on the evidence presented at trial, the failure to instruct on duress
26  did not have a substantially injurious effect on the jury's verdict.   Montanez
27  stated that he took his pants off and got on top of a naked Attig and took his
28  "turn."  Even assuming arguendo Montanez did not penetrate Attig, jurors could

have inferred, based on Montanez's presence at the scene and Stanton's testimony, that he participated in helping subdue Stanton and Lutes. As the prosecutor argued, subduing Lutes and Stanton could have facilitated Attig's rape by Steve, Archuleta and Chabayog by preventing the two men from coming to her assistance. Thus, there was strong evidence to support a finding that Montanez committed, or aided and abetted the rape of Attig.

In addition, Stanton testified three or four men participated in the attack, with at least one holding a gun to his head. After Attig was led away by Steve, at least two men initially stayed behind, bound Stanton and Lutes, rifled through their pockets, and took about $15. Montanez admitted to being present while the men were being held faced down on the ground. Montanez did not argue he was under duress to commit the robbery. Rather, he testified he did not participate in the robbery, and merely stood nearby as it happened. Even assuming Montanez was not the individual who took the money out of Stanton's pockets, or took Attig's purse, there was substantial evidence to support the conclusion that he, at the very least, helped facilitate the robbery by preventing Stanton and Lutes from resisting or escaping.

An error is not harmless if the reviewing court is "in grave doubt" as to whether the error had "substantial and injurious effect or influence" on the verdict. *See O'Neal*, 513 U.S. at 435. Given the scant evidence of duress in conjunction with the strong evidence of Montanez's guilt, this Court has no such grave doubt. Thus, the *Brecht* test is not met.

Accordingly, this Court finds the state court's denial of Montanez's claim was neither contrary to, nor an unreasonable application of, clearly established law. 28 U.S.C. § 2254(d); *Williams*, 423 U.S. at 412-13. Moreover, the failure to instruct the jury on the burden of proof for duress did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht,* 507 U.S. at 637-38. The Court **RECOMMENDS** the claim be **DENIED**.

**C.     Inconsistent Verdicts and Aiding and Abetting Instruction**

In his second claim, Petitioner argues his due process rights were violated when the trial court accepted inconsistent verdicts from the jury and when it improperly instructed the jury on aiding and abetting.  (Pet. at 42-53; Traverse at 7-11.)

1.     Procedural Default

Respondent argues this claim is procedurally defaulted.  (Mem. of P. & A. Supp. Answer at 15-16.)  Petitioner raised this claim in a petition for writ of habeas corpus to the California Supreme Court, which was denied without comment or citation.  (*See* Lodgment No. Lodgment No. 12 at 3-3I.)  Thus, this Court looks through to the California Court of Appeal's denial of Montanez's petition for writ of habeas corpus.  *See Ylst*, 501 U.S. at 806.  There, the appellate court stated:

> Montanez's first claim is procedurally barred.   "The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." (*In re Dixon* (1953) 41 Cal. 2d 756, 759.)   Montanez does not offer any new evidence outside the appellate record or special circumstances to justify making an exception to this rule.   His challenges to jury instructions and inconsistent verdicts should have been made in his direct appeal.

(Lodgment No. 11.)

Because the appellate court clearly applied the *Dixon* procedural bar, this Court presumes the California Supreme Court also found the claim defaulted under *Dixon*.  *See Lee v. Jacquez*, 788 F.3d 1124, 1133 (9th Cir. 2015) ( "If the California Supreme Court denies a habeas petition without explanation, the federal courts will presume that a procedural default was imposed if 'the last reasoned opinion on the claim explicitly impose[d] a procedural default.'")

"The procedural default doctrine 'bar[s] federal habeas [review] when a state court decline[s] to address a prisoner's federal claims because the prisoner

has failed to meet a state procedural requirement.'" *Calderon v. United States District Court*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  The doctrine "'is a specific application of the general adequate and independent state grounds doctrine.'" *Id.* (quoting *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994)). Under the adequate and independent state grounds doctrine, federal courts "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Id.* (quoting *Coleman*, 501 U.S. at 729); *Park*, 202 F.3d at 1151.

The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent must first have "adequately pled the existence of an independent and adequate state procedural ground." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  Once the defense is placed at issue, the burden shifts to the petitioner, who must then "assert[ ] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." *Id.*  The "ultimate burden" of proving procedural default, however, belongs to the state.  *Id.*  If the state meets this burden, federal review of the claim is foreclosed unless the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Respondent contends the procedural bar set fort in *Dixon* is independent of federal law, citing *Smith v. Crones,* 2010 WL 1660240, at 1 (E.D. Cal. Apr. 22, 2010) (Kozinski, Chief Judge, sitting by designation).  (Mem. P. & A. Supp. Answer at 15.)   As the appellate court noted, the California Supreme Court held in *Dixon* that claims brought on state habeas that could have been, but were not, brought on direct appeal, are barred from review under *Dixon*.  *Park*, 202 F.3d

at 1151 (citing *Dixon*, 41 Cal. 2d 756).  Before 1998, an asserted procedural bar based on *Dixon* was not an "independent" state rule.  *Id.* at 1151-53 (citing *In re Robbins*, 18 Cal.4th 770 (1998)).  This was so because, until 1998, a cite to *Dixon* meant that the state court necessarily considered federal law before applying the *Dixon* bar to any federal constitutional claims.  *Park*, 202 F.3d at 1151-53.

In *Robbins*, 18 Cal. 4th 770, the California Supreme Court stated that it would no longer consider federal law when denying a habeas claim as procedurally barred under *Dixon*.  *Bennett*, 322 F.3d at 582; *see also Park*, 202 F.3d at 1151.  The Ninth Circuit has not specifically determined whether a post-*Robbins* application of the *Dixon* rule is independent of federal law.  But when evaluating a different procedural bar with the same exceptions, the Ninth Circuit concluded "the California Supreme Court's post-*Robbins* denial of [petitioner's] state petition for lack of diligence (untimeliness) was not interwoven with federal law and therefore is an independent procedural ground."  *Bennett*, 322 F.3d at 582-83.  The *Bennett* court's analysis of the independence of the timeliness bar compels the same result for claims barred pursuant to *Dixon*.  *Id.* at 581-82; *see also LaCrosse v. Kernan*, 244 F.3d 702, 707 (9th Cir. 2001) (observing that consideration of federal law in barring claims as pretermitted is "analogous" to consideration of federal law in barring claims as untimely); *see also  Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1007-08 (S.D. Cal. 2004).  Accordingly, Respondent has met his initial burden under *Bennett* to establish that *Dixon* is an independent state procedural bar.  *Bennett*, 322 F.3d at 586.

Respondent has not, however, met his burden as to adequacy.  Nowhere in the Answer does Respondent even allege the *Dixon* rule is adequate.  Respondent merely states that "Montanez must establish that the procedural bar is inadequate."  (Mem. P. & A. Supp. Answer at 15.)  This is insufficient to satisfy Respondent's initial burden under *Bennett*.  *See Bennett*, 322 F.3d at 586

(stating the respondent must initially plead that the state procedural ground is independent and adequate).  Because the state court did not address the merits of this claim due to a procedural bar, this Court must conduct a de novo review of the claim.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).

### 2.    Merits

Montanez argues the trial court erred when it failed to "seek curative measures when jurors acquitted [him] of the underlying felonies, and still found him guilty of first degree murder."  (Pet. at 42-44.)  He claims that because the prosecutor relied solely on a felony murder theory, it was inconsistent to acquit him of the special circumstances allegations and yet still convict him of murder.  (*Id.* at 42-44, 46.)  The inconsistent verdicts, he argues, violated his due process rights.  He further contends his due process rights were violated when the trial court improperly instructed the jury on aiding and abetting.  (*Id.* at 44-46.) Finally, he alleges the prosecution failed to prove every element of felony murder beyond a reasonable doubt.  (*Id.* at 46.)

First, contrary to Petitioner's assertion, there is nothing inconsistent about the jury's verdicts.  As discussed above, the jury was instructed that Petitioner could be found guilty of first degree felony murder only if the prosecutor proved he committed the murder under at least one of two theories: (1) felony murder with an underlying felony of robbery and/or (2) felony murder with the underlying felony of rape.  (*See* Lodgment No. 1, vol. 5 at 1326; *see also* CALCRIM No. 548.)  The jury did not need to agree on the same theory.  (*Id.*) The trial court instructed the jury that Petitioner could be found guilty of first degree felony murder if it determined, beyond a reasonable doubt, that he had aided and abetted the robbery and/or the rape.[8]

---

[8] The trial court instructed pursuant to CALJIC No. 8.27:

If a human being is killed by any one of several persons engaged in the

With regard to the special circumstances allegations, under California law, "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved." *People v. Anderson*, 43 Cal. 3d 1104, 1147 (1987). Consequently, when there is evidence from which a jury could find that the defendant was an aider and abetter, rather than the actual killer, the trial court must instruct the jury on intent to kill as an element of the felony-murder special circumstance. *Id.* The trial court did just that in Montanez's case. The jury was instructed pursuant to CALJIC 8.81.17, as follows:

> To find that the special circumstance referred to in these instructions as murder in the commission of a Robbery, Rape, Sodomy or Oral Copulation is true, it must be proved:
>
> 1.   That the murder was committed while the defendant was engaged in the commission of Robbery, Rape, Sodomy or Oral Copulation.
>
> 2.   That the defendant *intended to kill a human being or intended to aid another in the killing* of a human being.
>
> 3.   That the murder was committed in order to carry out or advance the commission of the crime of Rape, Robbery, Sodomy or Oral Copulation or to facilitate the escape therefrom or to avoid detection.  In other words, the special circumstances referred to in

commission or attempted commission of the crime of Rape, all persons, who either directly and actively commit the act constituting that crime, or who, at or before the time of the killing, with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental.

If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of Robbery, all persons, who either directly and actively commit the act constituting that crime, or who, at or before the time of the killing, with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental.

(Lodgment No. 1, vol. 5 at 1313.)

these instructions is not established if the Rape, Robbery, Sodomy or Oral Copulation was merely incidental to the commission of the murder.

(Lodgment No. 1, vol. 5 at 1314 (emphasis added); *see also* Lodgment No. 2, vol. 20 at 3699.)

Petitioner claims the jury could not find him guilty of felony murder without finding that he was guilty of committing at least one of the underlying felonies. (Pet. at 44; *see also* Traverse at 10.)  This is true.  However, an acquittal as to the special circumstances allegations does not necessarily mean the jury found him "not guilty" of the underlying felonies.  A special circumstance true finding required more than just a finding Montanez committed the underlying felony.  It required an additional finding that he "intended to kill a human being or aid and abet another in the killing."  (CALJIC No. 8.81.17.)  Thus, a verdict of guilty on the felony murder crime is not necessarily inconsistent with a "not true" finding on the special circumstances allegations.

This conclusion is consistent with California law.  In *People v. York*, 11 Cal. App. 4th 1506 (1992), the jury found the defendant guilty of lewd or lascivious conduct and first degree murder but rejected a special circumstance that the murder was committed while the defendant was engaged in the commission of the lewd or lascivious act.  *Id.* at 1508-09.  The trial court concluded the special circumstances finding was inconsistent with a first degree murder conviction premised on a felony murder theory and granted a new trial on the murder count.  *Id.* at 1509.  On appeal, the appellate court reversed, holding that inconsistent verdicts are not improper, provided there is substantial evidence to support them.  *Id.*  The court further concluded that the jury's verdicts were not, in fact, necessarily inconsistent because given the specific facts of the case, it was possible that the jury could find that, while the defendant committed a murder and a lewd act on the victim, the lewd act was incidental to the murder and not the motivating factor in the murder.  *Id.* at 1510-11.

Likewise, here, the felony murder conviction is not necessarily inconsistent with the special circumstances acquittal.   The jury could have reasonably concluded that Petitioner aided and abetted the felony murder by committing, or aiding and abetting, the robbery and/or rape of Attig.  At the same time, the jury also could reasonably conclude that Montanez did not intend to kill or aid in Attig's killing, and thus acquit him of all special circumstances allegations. Indeed this verdict is consistent with Montanez's own testimony that Steve shot Attig after he, Cabanyog and Archuleta were walking back to the car. Accordingly, the jury's verdicts were not inconsistent.

Even assuming the verdicts were inconsistent, Montanez would not be entitled to relief.  The Supreme Court has held that conflicting verdicts are not necessarily unconstitutional.  *See United States v. Powell*, 469 U.S. 57 (1984); *Harris v. Rivera*, 454 U.S. 339 (1981); *Dunn v. United States*, 284 U.S. 390 (1932); *see also Ferrizz v. Giurbino*, 432 F.3d 990, 993 (9th Cir. 2005).  Likewise, inconsistent verdicts are not impermissible under California state law, as long as substantial evidence supports the conviction. *People v. Lewis*, 25 Cal. 4th 610, 656 (2001) ("It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand.").  As discussed elsewhere in this Report and Recommendation, the Court finds that there is substantial evidence supporting the verdict.

Petitioner next argues his due process rights were violated because the trial court improperly instructed the jury as to aiding and abetting, which permitted the jury to convict him "without necessarily determining that he acted with the requisite mens rea." (Pet. at 45.)   Under California law, an aider and abettor must "act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." *People v. Beeman*, 35 Cal. 3d 547, 560 (1984).  The trial court instructed Petitioner's jury pursuant to CALCRIM 401 that in order

to find Montanez guilty of aiding and abetting one of the underlying felonies, the prosecutor must prove:

> 1.  The perpetrator committed the crime;
>
> 2. The defendant knew that the perpetrator intended to commit the crime;
>
> 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND
>
> 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.
>
> If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

(Lodgment No. 1, vol. 5 at 1309 (emphasis in original).)  Contrary to Petitioner's contention, the instruction sets forth the proper mental state required under California law – namely that the government must prove the defendant intended to aid and abet the underlying felony.  *See Beeman*, 35 Cal. 3d at 560.

Petitioner's reliance on *People v. Chiu*, 59 Cal.4th 155 (2014) is misplaced. In *Chiu*, the California Supreme Court held that "an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine." *Id.* at 158-59.  But, as the court explicitly stated, the holding did "not affect or limit an aider and abettor's liability for first degree felony murder."  *Id.* at 166.  Here, Petitioner was convicted of first degree murder under the felony murder rule – not first degree premeditated murder. Thus, *Chui* does not apply.  *See People v. Culuko*, 78 Cal.App.4th 307, 322

(2002) ("An aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony murder rule.")

Finally, Montanez also appears to argue his due process rights were violated because the prosecution failed to prove every element of felony murder beyond a reasonable doubt. (*See* Pet. at 44-45.)  The Supreme Court has held that the due process clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005); *see also Cavazos v. Smith*, – U.S. – , 132 S.Ct. 2, 6 (2011) (per curiam ).  The Court must engage in a thorough review of the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H.*, 408 F.3d at 1275 (citing *Jackson*, 443 U.S. at 319).   A petitioner's insufficient evidence claim must be examined "with reference to the elements of the criminal offense as set forth by state law." *Juan H.*, 408 F.3d at 1275.

Furthermore, "[c]ircumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.) amended on denial of reh'g, 798 F.2d 1250 (9th Cir. 1986).   A petitioner faces a "heavy burden" when seeking habeas relief by challenging the sufficiency of evidence used to obtain a state conviction on federal due process grounds.  *Juan H.*, 408 F.3d at 1275.

Viewing the evidence in the light most favorable to the verdict, there was ample evidence to find Montanez guilty of felony murder.  As discussed above in section V(B)(2) of this Report and Recommendation, a reasonable juror could have inferred from Petitioner's own statements that he participated in, or aided

and abetted, the rape of Attig.  Under California law, rape is the "act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."  Cal. Penal Code § 261(a)(2).  Further, while the mere fact that a person is present at the scene of the crime or fails to prevent the crime does not, by itself, make him an aider and abettor, the jury could consider Montanez's presence at the scene or failure to prevent a crime in determining whether the he was an aider and abettor.  *See People v. Campbell*, 25 Cal. App. 4th 402, 409 (1994) (stating that presence at the scene of the crime, companionship, and conduct before and after the offense are some of the factors a jury may consider in determining aiding and abetting).

Here, Montanez stated that after Steve and either Cabanyog or Archuleta raped Attig, he took his pants off, got on top of a naked Attig and took his "turn."  (Lodgment No. 2, vol. 18 at 1869-70.)  Although he told detectives he could not remember if he penetrated Attig or ejaculated, when viewed in the light most favorable to the verdict, this evidence, and reasonable inferences drawn from it, is sufficient to support a finding that Petitioner participated in the rape.  Jurors could also infer, based on Montanez's presence at the scene and Stanton's testimony, that he participated in helping subdue Stanton and Lutes and by doing so, prevented the men from going to Attig's assistance.  (*See id.* vol. 11 at 616-18.)  Thus, viewing the evidence in the light most favorable to the prosecution, the Court finds a reasonable juror could conclude this was sufficient to find Montanez committed, or aided and abetted, the rape of Attig.  *See Jackson*, 443 U.S. at 324.

In addition, based on Stanton's testimony and Montanez's admitted presence at the scene, a juror could reasonably conclude Montanez participated in, or aided and abetted, the robbery.  Robbery is the taking of "property in the possession of another, from his person or immediate presence, and against his

will, accomplished by means of force or fear."   Cal. Penal Code § 211.   As discussed above, Stanton stated three or four men participated in the attack, with at least one holding a gun to his head.  (Lodgment No. 2, vol. 11 at 615-16, 618.)  After Attig was led away, at least two men initially stayed behind, bound Stanton and Lutes, rifled through their pockets, and took about $15.  (*Id.* at 618, 620.)  Stanton testified that at least one of the men who remained behind was armed.  (*Id.*)  Montanez testified he stayed back with Stanton and Lutes, who were being held face down on the ground, for a time after Steve took Attig away. (Lodgment No. 2, vol. 24 at 3379-80.)  He stated that Stanton and Lutes were saying, "Don't hurt us," and telling the attackers to take whatever they wanted. Montanez testified that he tried to calm the men down by telling them "I ain't going to hurt you."  (*Id.* at 3379.)  A reasonable juror could infer that Montanez assisted in subduing the two men, and as such, aided and abetted the robbery of Stanton.  Accordingly, after reviewing the record as a whole and viewing the evidence in the light most favorable to the verdict, there was more than enough evidence for a rational trier of fact to have found Montanez guilty beyond a reasonable doubt of felony murder.  *See Jackson*, 443 U.S. at 324.

Based on the foregoing, Montanez has not shown his due process rights were violated by the jury's verdicts or the trial court's instructions.  The Court therefore **RECOMMENDS** the claim two be **DENIED**.

### D.   Ineffective Assistance of Trial Counsel

In his third claim, Montanez argues he received ineffective assistance of trial counsel, in violation of his Sixth Amendment rights.  (Pet. at 49-53.)  He first claims trial counsel was ineffective in failing to move for a new trial after the jury returned inconsistent verdicts. (*Id.* at 49-50, 52-53.)  Montanez also argues trial counsel failed to adequately investigate and present evidence to support his duress defense.  (*Id.* at 50-53.)  Petitioner raised these claims in his petition for writ of habeas corpus filed in the California Supreme Court, which was denied

without comment or citation.  (Lodgment No. 12 & 13.)  This Court therefore looks through to the opinion of the California Court of Appeal. *See Ylst*, 501 U.S. at  806. The appellate court denied the claims, stating:

> As to Montanez's [ineffective assistance of trial and appellate counsel] claims, he has not stated a prima facie claim for relief based on the ineffectiveness of either his trial or appellate counsel. (*In re Clark* (1993) 5 Cal. 4th 750, 770.)  His allegations are conclusory and lacking in evidentiary support to show that his attorneys failed to act in a manner to be expected of a reasonable competent counsel and that there was a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 688-94.)

(Lodgment No. 11 at 2.)

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  Second, he must show he was prejudiced by counsel's errors.  *Id.* at 694.  Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).   Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689.  There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87.  The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).    "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial

process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687. Furthermore, on federal habeas, a petitioner must show the state court's adjudication was objectively unreasonable in denying an ineffective assistance of counsel claim.  Review of such claims are therefore "doubly deferential," because federal courts must "take a highly deferential look at counsel's performance through the deferential lens of [AEDPA]." *Elmore v. Sinclair*, 781 F.3d 1160, 1170 (9th Cir. 2015) (quoting *Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1403 (2011) (citations and internal quotation marks omitted)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

Here, Petitioner has not satisfied his burden.  First, defense counsel was not ineffective in failing to request a new trial based on inconsistent verdicts.  As discussed above in section V(C)(2), the verdicts were not necessarily inconsistent.   And even assuming they were, under California law, an inconsistent jury verdict is not invalid as long as the conviction is supported by substantial evidence and in this case there was substantial evidence supporting the verdict. *See York*, 11 Cal. App. 4th at 1510; *see also* Cal. Penal Code § 954. As such, defense counsel's failure to make a motion for a new trial was neither a deficient performance nor prejudicial because any such motion would have been denied. *See Jones v. Smith*, 231 F.3d 1227, 1239 n. 8 (9th Cir. 2000) (An attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel.) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)); *see also Matylinsky v. Budge*, 577 F.3d 1083, 1094 (9th Cir. 2009) (finding that a failure to make a futile objection fails both *Strickland* prongs) (citing *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989)); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

Next, Montanez has failed to show defense counsel was ineffective in investigating evidence regarding his duress defense.  Counsel has a duty to conduct reasonable investigations or to make a reasonable decision that investigation is unnecessary.  *Strickland*, 466 U.S. at 691.  A decision not to investigate must be assessed for reasonableness under the circumstances at the time, applying a "heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (quoting *Strickland*, 466 U.S. at 690-91).

Here, as discussed above, defense counsel presented evidence of duress, primarily through Petitioner's statements to police and his trial testimony. (Lodgment No. 2, vol. 20 at 2520, vol. 24 at 3319-20, 3334; *see also* Lodgment No. 1, vol. 4 at 1119-21.)  He also called Juan Cantu, Montanez's brother, to testify that when they were children, Steve used to beat Montanez and Cantu. (*Id.* vol. 23 at 3131.)   Montanez does not identify any specific witness or evidence that counsel failed to locate or that would have helped establish the duress requirements. *See* Petition, Traverse.  Montanez's general assertion that further investigation would have uncovered favorable evidence is insufficient to establish ineffective assistance of counsel. *Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir.1997) (petitioner's ineffective assistance claim denied where he presented no evidence concerning what counsel would have found had he investigated further, or what lengthier preparation would have accomplished); *see also Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009).

Petitioner argues defense counsel should have done more to obtain an expert witness "to support [his] duress defense." (Pet. at 50.)  Yet, Petitioner has not identified any experts who would have testified in his favor nor has he presented any evidence as to what any particular expert witness would have testified to and how it would have aided his duress defense. *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (petitioner failed to establish prejudice where he did "nothing more than speculate that, if interviewed," the witness

would have given helpful information); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculating as to what expert witness would say is not enough to establish prejudice); *Dows v. Wood*, 211 F.3d 480, 486-87 (2000) (no ineffective assistance of counsel for failure to call witnesses where petitioner did not identify an actual witness, provide evidence that the witness would testify, or present an affidavit from the alleged witness); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffectiveness claim because he offered no indication of what potential witnesses would have testified to or how their testimony might have changed the outcome of the hearing). Petitioner's own opinion as to what potential witnesses would have said is insufficient. Without any evidence that an expert witness would have testified in a manner that might have led to a different result at his trial, Montanez's bare allegations are insufficient to support his claim.

Accordingly, the state court's denial of Petitioner's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. The Court **RECOMMENDS** claim three be **DENIED**.

### D. Ineffective Assistance of Appellate Counsel

In claim four, Petitioner argues he received ineffective assistance of appellate counsel. (Pet. at 54-57.) Montanez raised this claim in his habeas petition to the California Supreme Court, which was denied. (*See* Lodgment 12 & 13.) Thus, this Court must "look through" to the California Court of Appeal's opinion. *Ylst*, 501 U.S. at 806. In denying Petitioner's claim, the court of appeal stated that Montanez failed to state a prima facie case for relief. (Lodgment No. 11.)

It is clearly established that "[t]he proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*." *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S.

527, 535-36 (1986)).  A petitioner must first show that his appellate counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.  Specifically, a petitioner must show that counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith*, 528 U.S. at 285.  He must then show he was prejudiced by counsel's errors.  *Strickland*, 466 U.S. at 694.  To establish prejudice, Montanez must demonstrate that he would have prevailed on appeal absent counsel's errors. *Smith*, 528 U.S. at 285.

The Ninth Circuit has observed that:

> [Strickland's] two prongs partially overlap when evaluating the performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason-because she declined to raise a weak issue.

*Miller*, 882 F.2d at 1434.  Appealing every arguable issue would do disservice to a client because it would draw an appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before the appellate court. *Id.* at 1428.

Here, Montanez claims appellate counsel was ineffective in failing to raise meritorious claims on appeal.  (Pet. at 54, *see also* Traverse at 12-13.) Specifically, he argues appellate counsel should have raised on appeal the arguments he presents in claims two and three of the instant petition.

As discussed in section IV(C)(2) of this Report and Recommendation, the jury verdicts were not inconsistent.  Even assuming they were, there was no error under state law. *Lewis*, 25 Cal. 4th at 656.  As such, appellate counsel's decision not to raise those claims on appeal was neither unreasonable, nor prejudicial. *Miller*, 882 F.2d at 1434.

Likewise, as discussed in section IV(D) of this Report and Recommendation, the Court has found that Montanez has not established ineffective assistance of trial counsel.  It follows that any claim for ineffective assistance of appellate counsel based on a meritless claim of ineffective assistance of trial counsel must also fail.  Appellate counsel's failure to raise it cannot constitute ineffective assistance. *See id.*

Accordingly, the state court's denial of Petitioner's ineffective assistance of appellate counsel claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d); *Williams*, 423 U.S. at 412-13.  The Court **RECOMMENDS** claim four be **DENIED**.

### E.    Cumulative Error

In his fifth claim, Petitioner contends his trial was rendered fundamentally unfair by the cumulative effect of the errors raised in grounds one through four. (Pet. at 58-59.)  Respondent argues the claim is unexhausted and fails on the merits.  (Mem. P. & A. Supp. Answer at 18-19.)

Habeas petitioners who wish to challenge either their state court conviction or the length of their confinement in state prison, must first exhaust state judicial remedies.  28 U.S.C. § 2254(b), (c); *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987).  To satisfy the exhaustion requirement, a petitioner must "'fairly present[]' his federal claim to the highest state court with jurisdiction to consider it, or . . . demonstrate[] that no state remedy remains available." *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).  To "fairly present" a claim, a petitioner must first provide the state courts with a "'fair opportunity' to apply controlling legal principles to the facts bearing upon his [or her] constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (quoting *Picard v. Connar*, 404 U.S. 270, 276-77 (1971)).

Here, Montanez's petition for writ of habeas corpus, filed with the California Supreme Court, makes two brief mentions of "cumulative" error.  In his

argument that he received ineffective assistance of appellate counsel, Montanez claims his appellate attorney should have argued that his trial counsel was ineffective for a number of reasons.  He states that "[a]ll of the errors not raised by Petitioner's appointed appeal counsel acted in conjunction/cumulative to render counsel's performance ineffective at the appellate level of stage [sic] of relief, causing Due Process violation at that level."  (Lodgment No. 12 at 5B.)  At the end of his ineffective assistance of appellate counsel argument, Montanez states:

> This Petitioner requests this court to consider the following information in [its] determination of this appeal.
>
> 1.) Cumulative error involving petitioner's trial attorney depriving him of his federal Constitutional Right to Due Process under the Fifth and Fourteenth Amendments, *See Smith v. Robbins*, 528 U.S. 259 (2000).

(Lodgment No. 12 at 5D.)  Petitioner argues in his Traverse that this is sufficient to satisfy the exhaustion requirement.  (Traverse at 14-15.)

Taken in context, it is not at all clear that Montanez was attempting to raise an independent claim of "cumulative error."  Instead, it appears he was arguing there were numerous instances of ineffective assistance of trial counsel, and appellate counsel was ineffective in failing to argue that, when combined, trial counsel's failures rendered his trial fundamentally unfair.  Nonetheless, this Court need not decide whether the claim was "fairly presented" to the California Supreme Court because, even assuming it is exhausted, it fails on the merits.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also  Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).  "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."

*Parle*, 505 F.3d at 927; *see also United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (stating that where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant").  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Fredereick*, 78 F.3d at 1381 (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).  Cumulative error warrants habeas relief only where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." *Parle*, 505 F.3d at 927 (quoting *Brecht*, 507 U.S. at  637).

Here, the appellate court found only that the trial court erred in failing to instruct the jury the prosecutor had the burden to disprove duress beyond a reasonable doubt.  The court, however, found the error harmless.  As discussed above, this instructional error does not rise to the level of a constitutional violation.  Furthermore, the error did not have a substantial or injurious effect on the jury's verdict.  Similarly, as set forth above, this Court did not find any other trial or appellate errors and the trial was not fundamentally unfair.  Where "there is no single constitutional error . . . there is nothing to accumulate to a level of a constitutional violation." *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *see also Hayes v. Ayers*, 632 F.3d 500, 523-24 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

Accordingly, even assuming claim five is exhausted, Petitioner is not entitled to relief.  The Court **RECOMMENDS** this claim be **DENIED**.

///

### F.    Evidentiary Hearing

Finally, Petitioner appears to request an evidentiary hearing.  (*See* Pet. at 1.)  This request, however, is foreclosed by the Supreme Court's decision in *Pinholster*, 131 S.Ct. at 1402.  There, the Supreme Court held that where habeas claims have been decided on their merits in state court, a federal court's review under 28 U.S.C.§ 2254(d)(1) – whether the state court determination was contrary to or an unreasonable application of established federal law – must be confined to the record that was before the state court.  *Pinholster*, 131 S.Ct. at 1398.  The Court specifically found that the district court should not have held an evidentiary hearing regarding Pinholster's claims of ineffective assistance of counsel until after the Court determined that the petition survived review under section 2254(d)(1).  *Id.* at 1398; *see also Gonzalez v. Wong*, 667 F.3d 965, 979 (9th Cir. 2011).  Here, the Court has determined that none of Petitioner's claims survive review under section 2254(d)(1).  Therefore, the Court **DENIES** Montanez's request for an evidentiary hearing.

## V.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Barry Ted Moskowitz under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For the reasons outlined above, the Court **DENIES** Petitioner's request for an evidentiary hearing.

In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** no later than **November 6, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

1     **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with

2  the Court and served on all parties no later than **December 4, 2015.** The

3  parties are advised that failure to file objections within the specified time may

4  waive the right to raise those objections on appeal of the Court's Order.  *See*

5  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d

6  1153, 1157 (9th Cir. 1991).

7

8  **DATED:** October 8, 2015                    _____

9                                                                Hon. Barbara L. Major
                                                                  United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28